IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DEBORAH STOCKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04CV173 |
| | ) | |
| CLONINGER FORD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEATY, District Judge.

This case came before the Court for a bench trial on Wednesday, April 5, 2006. Plaintiff Deborah Stocker ("Plaintiff") brought this case against her former employer, Defendant Cloninger Ford, Inc. ("Defendant") alleging that the Defendant breached its obligations under its health benefit plan by failing to pay claims submitted by Plaintiff's health care providers.

I.      LEGAL STANDARD

This case involves the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff's breach of contract claim is preempted by ERISA, so that Plaintiff's claim is treated as a federal claim under Section 502 of ERISA. See Darcangelo v. Verizon Communs., Inc., 292 F.3d 181, 195 (4th Cir. 2002). Ordinarily, because the Defendant's plan expressly grants discretionary authority to Defendant, the Court's review of Defendant's denial of benefits would be based on an abuse of discretion standard. See Elliott v. Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999). Under this standard, Defendant's decision would not be disturbed if it "is the result

of a deliberate, principled reasoning process and if it is supported by substantial evidence." Id.

Defendant's decision would be upheld if it is reasonable and based on substantial evidence, even

if the Court might have come to a different independent conclusion. See Booth v. Wal-Mart

Stores, Inc., 201 F.3d 335, 340-41 (4th Cir. 2000).

The Court of Appeals for the Fourth Circuit has listed a number of factors that courts

may consider when determining the reasonableness of a benefits decision:

> (1) the language of the plan; (2) the purposes and goals of the plan;
> (3) the adequacy of the materials considered to make the decision
> and the degree to which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in the plan and
> with earlier interpretations of the plan; (5) whether the
> decisionmaking process was reasoned and principled; (6) whether
> the decision was consistent with the procedural and substantive
> requirements of ERISA; (7) any external standard relevant to the
> exercise of discretion; and (8) the fiduciary's motives and any
> conflict of interest it may have.

Booth, 201 F.3d at 342-43. In Booth, the Fourth Circuit also noted that "[a] fiduciary's conflict

of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce

the deference given to a discretionary decision of that fiduciary. We have held that a court,

presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's

discretionary decision to the extent necessary to neutralize any untoward influence resulting

from that conflict." Id. at 343 n.2 (internal quotations omitted).

In this case, the plan benefits are both self-funded and managed by Defendant. While this

fact alone does not create a presumption of a conflict of interest, see Colucci v. Agfa Corp.

Severance Pay Plan, 431 F.3d 170, 179 (4th Cir. 2005), in this case, other facts show an actual

2

conflict of interest as recognized in Booth. For example, in this case, Plaintiff demonstrated that the Plan Administrator at Cloninger Ford, Mike Stewart ("Stewart") was closely aligned with Larry Cloninger, CEO of Defendant, and that Stewart consulted Larry Cloninger as to whether to deny benefits to Plaintiff. See Colucci, 431 F.3d at 180 ("For instance, we have found a conflict of interest when an employee demonstrated that the administrator, who was *closely* aligned with the plan sponsor's leadership, relied on biased information provided by the plan's sponsor." (italics in original)). Accordingly, the Court will apply a modified abuse of discretion standard. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989). Under this modified abuse of discretion standard, the reasonableness of Defendant's decision to deny benefits must be weighed in the context of the conflict of interest. See Bailey v. Metropolitan Life Ins. Co., No. 2:96CV00719, 1997 U.S. Dist. LEXIS 19480, at *7 (M.D.N.C. Oct. 3, 1997). Applying this standard in the present case, and based on the evidence presented during the trial in this matter, the Court makes the following findings of fact and conclusions of law.

II.     FACTUAL FINDINGS

Plaintiff and Defendant stipulated to a number of undisputed facts, which the Court now adopts as part of its factual findings:

1.      That Plaintiff was an employee of Defendant from February 18, 1998 until August 23, 2002, during which time she was a participant in the Cloninger Ford Toyota Employee Health and Welfare Benefit Plan (hereinafter, "the Plan") while

3

employed by Defendant;

2.    That Plaintiff elected to continue her participation in the Plan from August 24, 2002 through January 23, 2003;

3.    That the Plan was self-funded by Defendant, with contributions in the form of monthly premiums paid by the Plan Participants;

4.    That from August 24, 2002 through January 23, 2003, Plaintiff contributed monthly premiums totaling $1,430.19 for benefits provided to her under the Plan;

5.    That between August 24, 2002 and January 23, 2003, Plaintiff and her healthcare providers submitted claims for medical benefits payable under the Plan, subject to co-pays, deductibles, and contractual adjustments, in the total amount of $13,879.01;

6.    That the aforesaid medical benefit claims were denied by Defendant, with no payments made to Plaintiff or to her medical providers;

7.    That Plaintiff appealed Defendant's denial of her medical benefit claims to the point where she exhausted her administrative remedies under the Plan.

The Court makes the additional Findings of Fact based upon testimony adduced during the trial:

8.    That Plaintiff was injured when she was bumped by a horse in late August, 2002, and then again, when she fell from a horse, on September 23, 2002;

9.    That both incidents occurred at the farm of Lisa Stehr ("Stehr"), a friend of

4

Plaintiff;

10.     That the first incident occurred while Plaintiff was riding Stehr's own horse, named Waldo;

11.     That the second incident occurred while Plaintiff was riding a horse, named K.C., that Stehr was training for another person;

12.     That in neither incident was Plaintiff being paid by Stehr or given any bartered exchange for riding, training, or assisting with the horses;

13.     That Defendant had retained the services of Tucker Administrators, Inc. ("Tucker Administrators") to act as the Claims Administrator for claims submitted under the Plan;

14.     That following Plaintiff's medical treatment, her medical bills were submitted by her health care providers to Tucker Administrators for processing and payment;

15.     That Plaintiff received a request from Tucker Administrators to provide more information regarding how she was injured.  More specifically, on October 8, 2002, Jan Joyner ("Joyner"), a claims administrator for Tucker Administrators, sent Plaintiff a letter requesting information.  That letter asked whether the claim was the result of an accident, to which Plaintiff responded "yes."  Plaintiff further stated that she "fell off a horse."  The letter then asked, "Was injury or illness work related? () Yes () No."  Plaintiff did not check either box, but instead wrote in that she was "self employed at this time.";

5

16.	That upon receipt of this response by Plaintiff, Joyner sent the letter back to Plaintiff with the hand-written notation that stated as follows: "Pls advise whose horse it was (if not your own) and if you were working @ the time of your accident and where your accident occurred.  Thanks.";

17.	That in response to Joyner's follow-up inquiry, Plaintiff mailed a six-page, hand-written letter to Joyner on October 24, 2002.  The letter was received by Tucker Administrators on October 28, 2002.  The letter described the first accident as follows: "On October 28, 2002,[1] I fell off a horse.  The horse is owned by a friend of mine, Lisa Stehr.  His name is Waldo.  At the time, I was helping her start this young horse." Plaintiff's letter described the second accident as follows: "The second, more serious accident occurred the morning of September 23, 2002.  I was working again at the farm of Lisa Stehr.  That day, I was working alone - there was no one else on the property.  This horse's name is Snitty, aka KC.  This horse is owned by a client of Lisa's and had come to the property for training.";

18.	That Plaintiff's letter also stated the following: "At the time of both accidents, I was self-employed and hired by a variety of people to teach riding lessons and train horses.  These accidents occurred during my normal course of work, and nothing about the working situation seemed out of the ordinary.";

---

[1] The Court notes that Plaintiff stated this date in error.  Plaintiff's first accident occurred on or about August 28, 2002.

6

19.     That following receipt of Plaintiff's letter by Tucker Administrators, Joyner and her supervisors, Anne Parker, senior vice president, and Michelle Belcher, claims manager, decided that Plaintiff's claim was likely excluded by the Plan's "work exclusion." This exclusion states as follows: "Occupational. Care and treatment of an Injury or Sickness that is occupational – that is, arises from work for wage or profit including self-employment.";

20.     That at some point between October 28, 2002 and November 11, 2002, either Anne Parker or Michelle Belcher contacted Stewart, the Plan Administrator at Cloninger Ford, to seek his approval to deny Plaintiff's claim based upon the "work exclusion";

21.     That at some point between October 28, 2002 and November 11, 2002, Stewart considered Plaintiff's six-page hand-written letter and agreed that Plaintiff's claim should be denied based upon the "work exclusion";

22.     That subsequent to this decision by Stewart, Tucker Administrators notified Plaintiff that her claims had been denied based upon the "work exclusion";[2]

23.     That on January 1, 2003, Plaintiff sent a second letter to Tucker Administrators

---

[2] The Court notes that there appear to be numerous procedural irregularities with Tucker Administrators' notification to Plaintiff of the initial denial of her claims. Neither side submitted into evidence a written document detailing this denial, as required by the Plan. Accordingly, the Court cannot determine whether this initial denial followed the Plan's procedures, including referring Plaintiff to the specific Plan provisions on which the determination was based or describing the Plan's review procedures, including the right to bring a civil action under Section 502 of ERISA following an adverse benefit determination.

7

to appeal the denial of the claims.  In this letter, Plaintiff stated that when she used the word "working" in her previous letter, she meant "helping," and that she was not paid by Stehr for this help.  Plaintiff, however, did not provide, nor did Tucker Administrators request, any additional documentation;

24. That the Plan provides that the appeal review "will not afford deference to the initial adverse benefit determination and will be conducted by a fiduciary of the plan who is neither the individual who made the adverse determination nor a subordinate of that individual."  Cloninger Ford/Toyota is identified in the Plan as the Plan Fiduciary.

25. That in response to Plaintiff's appeal letter, Tucker Administrators forwarded Plaintiff's file to Stewart as the decision-maker on the appeal;

26. That Stewart consulted with Larry Cloninger, president of Defendant, and determined for a second time that the "work exclusion" applied so as to deny Plaintiff's claim;

27. That Stewart dismissed Plaintiff's letter of explanation dated January 1, 2003 as a self-serving attempt to explain her previous letter and decided that the letter did not contain any new evidence, despite the fact that Plaintiff stated for the first time in the letter that she was not paid by Stehr for helping on the farm.  Neither Stewart nor Tucker Administrators engaged in any further investigation after receiving Plaintiff's January 1, 2003 letter;

8

28. That Stewart thereafter instructed Tucker Administrators to send a letter to Plaintiff on January 10, 2003 notifying her of this second adverse decision;

29. That Plaintiff sought further appellate review of the denial of her claim by engaging the services of an attorney, who wrote to Tucker Administrators;

30. That the response to Plaintiff's counsel's letter was made in a letter by Stewart whereby Stewart restated the initial grounds for the denial of the claims;[3]

31. That the Plan grants discretionary authority to the Defendant, as Plan Administrator, to determine eligibility for Plan benefits and interpretation of Plan provisions;

32. That the determinations made by Defendant to deny Plaintiff's benefit claims were heavily influenced by Defendant's conflict of interest. Proof of this conflict of interest includes the fact that during discovery, Defendant denied that Larry Cloninger, CEO of Defendant, was involved in any way in the adverse benefits determination, but that during examination of Stewart, he stated that he consulted with Larry Cloninger in making the adverse benefits determination. Moreover, Stewart stated that he disregarded Plaintiff's statement concerning whether she

---

[3] Stewart also stated in this letter that Plaintiff's claim would be otherwise denied by the Plan because of the "hazardous activities" exclusion. However, during testimony, Stewart admitted that: the Plan had covered accidents involving horses prior to the Plaintiff's claim; that the Plan covered 4-wheel activities by other employees of Defendant; that he had the discretion under the Plan to determine what was a hazardous activity and horseback riding was not specifically noted as such in the Plan; and, finally, that including the "hazardous activities" language in this letter to Plaintiff was an error by Defendant's counsel at the time.

9

was being paid by Stehr because he believed that Plaintiff had left employment at Cloninger Ford in order to pursue self-employment in the horse training business. Further proof of a conflict of interest was the statement in an e-mail between Anne Potter and Stewart concerning the fact that if Plaintiff's claims went above $20,000, the insurance carrier who covered Defendant's excess liability under the Plan would conduct its own review of Plaintiff's claims and might determine that the claims would not be covered under the Plan;

33.     That Defendant conducted no investigation into whether Plaintiff was in fact "work[ing] for wage or profit" at the time of the two accidents, including failing to contact Stehr as to her relationship with Plaintiff and instead relying on Stewart's knowledge that Larry Cloninger had in the past directed Stewart to pay Stehr, on behalf of Cloninger Ford, for horse training services she provided to Larry Cloninger's daughter; and

34.     That Plaintiff's first letter to Tucker Administrators was inconclusive as to whether she was, in fact, working *for wage or profit*, and that her second letter denied the same so as to suggest that further investigation by Tucker Administrators or Stewart was warranted.

The Court makes the following Conclusions of Law:

1.     That this matter is properly before the Court, sitting as the trier of fact, for trial on the merits;

10

2.    That Plaintiff is a plan beneficiary seeking payment of medical benefits under an
employer-sponsored benefit plan pursuant to 29 U.S.C. § 1132(a)(1)(B);

3.    That Defendant is a plan administrator of a self-funded employer sponsored
benefits plan within the purview of 29 U.S.C. § 1001, *et seq.*;

4.    That this matter is before the Court to review Defendant's denial of Plaintiff's
claim for plan benefits;

5.    That the standard of review is a modified abuse of discretion standard, taking into
account Defendant's conflict of interest based on the fact that the plan was self-
funded and self-administered, as well as the fact that the admitted decision-making
process involved the Plan Administrator, Stewart, consulting closely with the Plan
funder, Larry Cloninger;

6.    That Defendant denied Plaintiff's claim for medical benefits without providing
Plaintiff a meaningful appeal and without having substantial evidence to support
denial of Plaintiff's claim. See Booth, 201 F.3d at 342-43. Defendant ignored the
language of its own plan when it had the same decision-maker consider both
Plaintiff's initial claim and Plaintiff's appeal, a procedure that is banned by the
Plan.[4] Moreover, Defendant failed, at least during Plaintiff's appeal, to consider

---

[4] While Stewart testified at various times that the initial decision was made by Tucker
Administrators to deny Plaintiff's claims, the Court notes that in accordance with the Plan,
Tucker Administrators was not a fiduciary of the Plan and had no authority to deny a claim.
Stewart also testified at various times that he was the ultimate decision maker with regard to
Plaintiff's claims, but later stated that Roman Pibl, an attorney for Defendant, was in fact the

11

the adequacy of the materials before it in making its decision. This is because

Defendant at no time sought out any additional evidence that would prove or

disprove Plaintiff's statement on January 1, 2003 that she was not working for

profit at the time of her injuries. Instead, the decision-maker, Stewart, disregarded

Plaintiff's statement not because of any actual evidence before him, but instead

because he believed – without any actual knowledge of this fact – that Plaintiff had

left employment at Cloninger Ford in order to pursue self-employment in the

horse training business. In fact, Stewart stated during his examination that he

made the determination that Plaintiff was, in fact, working for profit, and could

not have been engaging in a pleasure pursuit or hobby, because "she was training

a horse that wasn't hers." Accordingly, the decision-making process was neither

consistent with the Plan, nor was it reasoned and principled. See Bernstein v.

CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995);[5]

---

individual involved in deciding Plaintiff's appeal. However, Roman Pibl is also not named in the Plan as the fiduciary. The Court finds by a preponderance of the evidence that Stewart was involved in making the initial decision to deny Plaintiff's claims, and was the decision-maker as to Plaintiff's appeal, as well, which was contrary to the rules of the Plan.

[5] Defendant's reliance in its Trial Brief on the unpublished case of Sammarco v. Board of Trustees, Local 812 Health Fund, No. 03 Civ. 433(FM), 2004 WL 1488210 (S.D.N.Y. July 1, 2004), is misplaced. The Court has reviewed this case and finds that in that matter, the court in finding no abuse of discretion by the plan administrator noted that there was "not a scintilla of evidence that [plaintiff] advised the Administrator or the Trustees prior to the date that the Trustees denied his appeal that the accident was not work related." Id. at *6. However, in this case, prior to the second decision by Stewart, Plaintiff had submitted a letter denying that she was working for profit, and explaining that her use of the word "working" in her previous letter was

12

7. That Defendant's denial of Plaintiff's claim for medical benefits amounted to an abuse of discretion.

III. CONCLUSION

Having reviewed and considered all of the evidence and arguments presented by the parties, the Court concludes that Plaintiff has established that Defendant's decision to deny payment of her medical expenses was an abuse of discretion. The Court will therefore enter Judgment in favor of Plaintiff. The Court will award Plaintiff the sum total of her medical benefits, $13,879.01, plus interest at the rate of 8 percent from and after January 1, 2003, until paid. Additionally, the costs of this action will be taxed against Defendant, including an award of attorney's fees to Plaintiff's attorney. In this regard, the Court will order Plaintiff to submit an affidavit to the Court within ten (10) days of the date of this Judgment in order for the Court to determine an award of costs and attorney's fees.

A Judgment consistent with these Findings and Conclusions will be entered contemporaneously herewith.

This, the 1st day of May, 2006.

United States District Judge

---

simply a common term in the horse business to mean working the animal, similar to how a person might use the term "working" in describing their activities in a garden. Accordingly, there was significant evidence in this case that Plaintiff's accident was not work related prior to the decision on Plaintiff's appeal, but Defendant chose to ignore this evidence and refused to further investigate the accidents.

13

14